UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBY G. RAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:13CV30 AGF |
| | ) | (TIA) |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act.  The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On June 29, 2010, Plaintiff filed an application for Disability Insurance Benefits.  (Tr. 74, 134-40)  He filed an application for Supplemental Security Income on July 7, 2010.  (Tr. 82, 141-46)  Plaintiff claimed that he became unable to work on February 24, 2009 due to depressive disorder, acute pharyngitis, shoulder joint pain, carpal tunnel in arms and elbows, asthma, and allergies.  (Tr. 86)  The applications were denied on November 18, 2010, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 74, 82-89, 92)  On December 1, 2011 Plaintiff testified at a hearing before the ALJ.  (Tr. 35-73)  In a decision dated January 24, 2012, the ALJ found that Plaintiff had not been under a disability from February 24,

2009 through the date of the decision.  (Tr. 12-28)  The Appeals Council denied Plaintiff's request for review on December 11, 2012.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff's attorney first provided an overview of Plaintiff's allegations, stating that Plaintiff had previously worked with his upper extremities as an electrician.  He had surgeries in both wrists and both elbows, and doctors recommended surgery for both shoulders.  The attorney noted that Plaintiff was in constant pain from overuse of his upper extremities.   In addition, he suffered from depression, anxiety, COPD, hypertension, and diabetes.  (Tr. 39-41)

The ALJ then questioned Plaintiff , who testified that he was 52 years old and lived in a ranch house with his wife, oldest daughter, three-year-old grandchild, and his wife's niece.  He had a total of ten grandchildren.  Plaintiff's source of income included his wife's part-time job with the U.S. Post Office, and her thirteen-year-old niece's checks from Social Security and the State.  Plaintiff also received food stamps.  Neither Plaintiff nor his wife had health insurance.  (Tr. 42-44)

During a typical day, Plaintiff usually slept in because he had difficulty sleeping at night. When he woke up, he made coffee, and he sat down and watched the news.  Plaintiff was able to make the bed and clean up the kitchen mess after dinner.  Plaintiff did not drive due to his coughing spells.  Plaintiff saw a nurse practitioner, Sharon Grass, for his cough.  Nurse Grass prescribed steroids, cough syrups, and pills.  He was resistant to the pills, but the steroids helped.  (Tr. 44-45)

Plaintiff also saw a social worker three times, as well as a psychiatrist, who he saw only on one occasion. Plaintiff received medication from both individuals, including Cymbalta and an anti-anxiety medication. (Tr. 45-47)

Plaintiff further testified that he stopped working in February 2009 after having hand, elbow, and shoulder surgeries in 2008. He tried to go back to work but re-tore something, necessitating that he quit his job as an electrician. Plaintiff stated that 90 percent of his work involved working overhead and that he had difficulty raising his arms and lifting things. In addition, Plaintiff experienced allergic reactions to dust and mold found on construction sites, which would lead to bronchitis and pneumonia. He testified that he would miss about a month of work each year in the five years leading up to 2008. (Tr. 47-49)

In addition to his other health care providers, Plaintiff saw Dr. Pasia for pain. Plaintiff mentioned that Dr. Pasia performed a nerve conduction test and found neck problems stemming from arthritis in his vertebra. However, the test was not included in the medical file. Dr. Pasia advised Plaintiff to seek therapy, but that did not help. Plaintiff acknowledged that he had only recently seen Dr. Pasia. (Tr. 49-51)

Plaintiff further testified that he had not performed any construction, electrical, or home improvement work since his alleged onset date. His son helped him with projects around the house. Plaintiff liked to fish, but the last time he tried, he started to feel the pain in his hand, forearm, and shoulder. When the ALJ asked whether Plaintiff could do other work that did not require reaching overhead and was not as physically taxing as an electrician, Plaintiff stated that he was unable to do anything due to his allergies and inability to drive. With regard to Plaintiff's depression, he stated

that the Celexa, Wellbutrin, and Prozac helped some but not completely. He began taking anti-depressants in 2010. (Tr. 51-54)

Plaintiff began working as an electrician for his family's business but then joined the union and worked for Schaffer Electric for about six years. From 1993 through February 2009, Plaintiff worked full-time as an electrician. He estimated that he lifted between 300 and 400 pounds. He did not drink, smoke, or use illegal drugs. Plaintiff completed the 11th grade in school and obtained his GED. He previously received Worker's Compensation for about eight months in 2008, as well as money from his 401K. Plaintiff believed that he could walk four blocks before running out of breath; stand for one hour; lift ten pounds; and sit comfortably for about an hour. He weighed 254 pounds. Plaintiff regularly took the medications that he received at no coSte. (Tr. 54-59)

Further, Plaintiff testified that he became anxious and nervous, and he did not like being around other people. He cried a lot and felt overwhelmed, but he was never hospitalized for mental health issues. His wife cooked, and his daughter did the grocery shopping and tried to take Plaintiff with her. Plaintiff had no friends but went fishing in July with his ten grandchildren. While fun, Plaintiff suffered the next day. Plaintiff was able to get along with coworkers, although he could not keep up with them. He did not go to church or play bingo. Plaintiff watched TV and movies. He very seldom used the computer but did have a Facebook page with uploaded pictures. He testified to experiencing problems with his memory, which included forgetting his kids' names or forgetting what he was doing. Plaintiff did not have a criminal record and had never been fired from a job. (Tr. 59-61)

Plaintiff's attorney also questioned Plaintiff, who testified that he was diagnosed with arthritis in 2008 or 2009, which prompted the second surgery on his shoulder. He stated that the arthritis was

in his shoulders, neck, and hands. Plaintiff's treatment was primarily through Nurse Practitioner Grass. He also had problems with his right ankle, upon which he had surgery after a break. He continued to experience swelling and difficulty standing for long periods, along with a little instability. Plaintiff also had some problems walking up and down ladders or stairs. (Tr. 61-63)

Plaintiff corrected his earlier testimony by acknowledging that he previously had a cocaine habit for about two years in high school. He last used cocaine when he was 17 years old. Plaintiff also used marijuana but stopped when his first daughter was born in 1991. (Tr. 64-65)

A vocational expert ("VE"), Brenda Young, also testified at the hearing. The VE first identified Plaintiff's vocational history, noting that his past work was as an electrician, which was classified as medium work but almost always performed as heavy work. Plaintiff had acquired skills which he could use in jobs in the similar industry. The ALJ then asked the VE to assume a person with an 11th grade education and GED, who was 49 years old and had Plaintiff's past work experience. In addition, the person was capable of doing light work with only occasional reaching overhead, and he needed to avoid concentrated exposure to irritants. Given this hypothetical, the individual could not perform Plaintiff's past work. However, the person could perform other jobs in the light work category including security guard positions, retail sales positions, and light assembly jobs, small product assembly. (Tr. 65-68)

The ALJ then added the limitations of a sit/stand option to briefly change positions every hour; only occasional climbing of ramps or stairs; no climbing ladders, ropes, or scaffolds; only occasional stooping, kneeling, crouching, or crawling; and an avoidance of concentrated exposure to hazardous machinery. The VE testified that the retail sales jobs and assembly positions would be

eliminated. Further, the security guard positions would be reduced to half. However, the person could perform reception or information clerk type jobs, as well as file clerk positions. (Tr. 68-69)

Finally, the ALJ asked to VE to assume the additional limitations of only occasional interaction with the public; work limited to simple, routine tasks; and inability to sustain sufficient concentration, persistence, or pace to do simple, routine tasks on a regular and continuing basis during a work day and work week. Based on this person's inability to concentrate, no jobs would be available. Further, the VE noted that employers customarily allowed one unscheduled absence a month and that exceeding these limits on a regular basis would eliminate work in a competitive market place. (Tr. 69-70)

At the close of the hearing, Plaintiff's attorney noted references in the medical file to a history of COPD. However, the attorney did not see any records indicating pulmonary testing. The ALJ agreed to leave the record open to allow Plaintiff to update the record with test results and office visits from Dr. Pasha, as well as pulmonary tests. (Tr. 71-72)

In a Function Report – Adult, Plaintiff stated that during the day he woke up; turned on coffee; took his medication; fixed a bowl of cereal; watched TV intermittently throughout the day; got on the computer; ate lunch; cleaned dishes and loaded in dishwasher; walked outside; ate dinner; and wiped down counter tops. If his grandchildren visited, he sat with them and watched TV or watched them play in the yard. He was able to care for his personal needs. Plaintiff was able to clean up the dishes, wipe down counters, and help change bed linens. He did not perform yard work because pushing the mower and using the weed eater hurt his hands and shoulders. Plaintiff was able to shop in stores and via internet. He mostly shopped for small items, including groceries, cleaning products, and personal products. Plaintiff reported that using a computer mouse was more difficult

since his condition began. He became easily agitated, but his medication helped him cope with stress. He no longer talked to friends or went out. His condition affected his ability to lift, reach, walk, stair climb, remember, complete tasks, concentrate, use hands, and get along with others. He opined that he could walk ½ mile before needing to rest for 10 to 15 minutes. He could pay attention for an hour and could follow uncomplicated written and spoken instructions. Plaintiff did not like to be around crowds. He wore glasses and used hand braces daily. (Tr. 206-13)

### III.  Medical Evidence

On January 25, 1999, Plaintiff underwent surgery to repair a broken ankle. (Tr. 347) Plaintiff again underwent surgery on January 19, 2000 to remove the hardware that had been placed in 1999 due to irritation. (Tr. 348)

Beginning in January, 2005, Plaintiff saw Sharon Grass, RN, MSN FNCP for complaints of upper respiratory problems and mild GERD symptoms. On January 18, 2005, Nurse Grass assessed bronchitis, GERD, and weight gain. On March 29, 2005, Plaintiff reported continued bronchitis with frequent coughing, as well as complaints of tingling in the right arm and hand, exacerbated by use. Nurse Grass assessed reactive airway disease, bronchitis, hypertension, and early carpal tunnel on the right. Plaintiff complained of right elbow pain on January 27, 2006, and nurse Grass recommended an elbow brace and exercises. Nurse Grass continued to treat Plaintiff in 2006 and 2007, primarily for cough and other upper respiratory symptoms. (Tr. 372-87)

Between June 2007 and January 2008, Plaintiff was seen four times at Thoracic & Critical Care Medicine, LLC, for complaints of asthma. Dr. Farris Jackson, Jr., and Dr. Amanda E. Avellone assessed mild reactive airway disease, history of chronic rhinitis with allergies, GERD, and recurrent bronchopulmonary infections. (Tr. 836-844)

Plaintiff underwent sinus surgery on July 6, 2007, to treat his chronic sinusitis. On July 17, 2007, Plaintiff reported feeling significantly improved. (Tr. 840-41) On March 12, 2008, he attended a follow up visit for sinus surgery. The surgeon, Dr. James Dean Gould, noted improved bilateral sinusitis and allergic rhinitis. When Plaintiff followed up with Dr. Gould again on March 27, 2008, he reported overall improvement from the surgery with some post-nasal drainage, productive cough, and nasal congestion. Plaintiff also experienced significant improvement in allergic symptoms and problems from immunotherapy treatment. On September 25, 2008, Dr. Gould noted significant improvement since the sinus operation. However, Plaintiff had problems with green/yellow sputum production which began after returning to work approximately three weeks ago, when working in a dusty/possibly moldy environment. Plaintiff continued to receive allergy injections throughout 2007, 2008, and 2009. (Tr. 243-66)

On October 29, 2007, Plaintiff reported that he was experiencing right shoulder discomfort, and nurse Grass noted a history of recently performing much overhead work. He also reported numbness, diminishing strength, and tingling of both hands that had been increasing recently, especially at night, with no significant pain. He further complained of GERD, asthma, and chronic sinusitis, which had improved since rhinoplasty and sinus surgery. Nurse Grass assessed asthma; carpal tunnel; hypertension; GERD; and osteoarthros, NOS – unspecified shoulder pain. (Tr. 367-69)

Plaintiff was seen at Tesson Heights Orthopoedic & Arthroscopic Associates on November 12, 2007 for complaints of problems in his hands, including his hands falling asleep five nights of the week. He also reported experiencing pain in his shoulders and neck. Dr. Stephen M. Benz noted full range of motion of Plaintiff's shoulder with a positive impingement sign and

no real rotator cuff weakness.  X-rays showed some degenerative arthritis in the neck but were normal with regard to shoulders.  Dr. Benz opined that Plaintiff had carpal tunnel syndrome and impingement syndrome of his shoulder.  He planned to schedule an MRI of the left shoulder and a nerve conduction study.  Dr. Benz also prescribed Naprosyn and a wrist splint. (Tr. 342)

Dr. Benz continued to see Plaintiff for shoulder pain.  On November 28, 2007, Dr. Benz noted that the MRI of Plaintiff's left shoulder indicated a complete rotator cuff tear.  Dr. Benz treated Plaintiff with cortisone injections.  On December 21, 2007, Dr. Benz noted a significant amount of arthritis in Plaintiff's left shoulder.  Dr. Benz ordered an MRI of the right shoulder and planned to discuss treatment after receiving the results.  On January 15, 2008, Dr. Benz noted that the most recent MRI showed a very high grade, most likely complete, rotator cuff tear.  Plaintiff underwent surgery on February 5, 2008 to repair his right shoulder rotator cuff.  By March 18, 2008, Plaintiff reported feeling a lot better, with better range of motion and strength. (Tr. 345-46, 585-88)

On April 1, 2008, Plaintiff underwent a debridement of the glenoid labral tear and an open acromioplasty and rotator cuff repair on his left shoulder.  On April 22, 2008, Dr. Benz noted some weakness and recommended physical therapy for strengthening and range of motion.  Dr. Benz was pleased with Plaintiff's progress during a May 13, 2008 follow-up visit, noting that he was going to cut off pain medications and encourage Plaintiff to do activities as tolerated with no restrictions.  Plaintiff was to return to work in July.  (Tr. 343, 583-85)

On March 12, 2008, Plaintiff returned to Thoracic & Critical Care Medicine, LLC.  Dr. Avellone assessed chronic cough, related to GERD, and GERD, generally well controlled on medication.  She encouraged Plaintiff to elevate his head during sleep.  (Tr. 679-680)

Plaintiff was seen at the Orthopedic Center of Ste. Louis on April 21, 2008. Dr. David M. Brown noted that Plaintiff had symptoms and findings on his examination consistent with a peripheral compression neuropathy. Dr. Brown recommended nerve conduction studies and released Plaintiff to full duty with no restrictions. (Tr. 277-78)

Nerve conduction studies on April 22, 2008 revealed bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome. (Tr. 276, 436) Plaintiff underwent right cubital tunnel release and right carpal tunnel release surgery on June 12, 2008, as well as left cubital tunnel release and left carpal tunnel release surgery on July 3, 2008. (Tr. 285, 290). He experienced significant post-operative pain and received a nerve block. (Tr. 339)

Plaintiff participated in physical therapy after surgery. At his last appointment on September 4, 2008, he complained of continued numbness to his right elbow and pain to his left elbow. Plaintiff's therapist noted that Plaintiff showed good progress but had expressed concern with return to work and his ability to be able to carry and climb. (Tr. 449) Plaintiff attended several follow up visits with the orthopedist, Dr. Brown, who noted that Plaintiff was doing very well, with no numbness and tingling in the right hand and only some numbness in the left little and ring fingers. Dr. Brown released Plaintiff on November 10, 2008 to full duty with no restrictions. (Tr. 270, 423-427)

On September 25, 2008, Plaintiff stated that he was doing well with his breathing. He denied cough and indicated that his acid reflux was well-controlled. He had returned to work. Dr. Avellone assessed mild reactive airways disease without exacerbation and advised Plaintiff to return in one year. (Tr. 677-78)

On February 16, 2009, Plaintiff underwent another MRI of his left shoulder due to pain. The MRI showed post-surgical changes and a focal full thickness tear/defect in the anterior aspect of the distal supraspinatus tendon. (Tr. 696)

On March 3, 2009, Plaintiff presented to the Ste. Genevieve County Memorial Hospital Physician's clinic for a follow up appointment pertaining to pain in his left shoulder. Nurse Grass recommended that Plaintiff discuss disability with Dr. Benz. (Tr. 351-55)

On April 3, 2009, Dr. Benz noted that Plaintiff was making slow progress and that he needed to continue physical therapy. On May 15, 2009, Plaintiff was doing better and did not have nearly the pain or discomfort that he experienced before. Dr. Benz advised Plaintiff to continue with physical therapy. Although Dr. Benz kept Plaintiff off work, Plaintiff was able to do activities as tolerated. On August 7, 2009, Plaintiff reported intermittent pain in both shoulders. Plaintiff had full range of motion in his shoulders, with weakness and positive impingement sign. Dr. Benz administered a cortisone injection. On November 17, 2009, Plaintiff complained of persistent pain in his shoulders, exacerbated by use and overhead activity. Dr. Benz administered a Depo-Medrol injection and opined that Plaintiff was disabled from working as an electrician. (Tr. 683-85)

On October 20, 2009, Plaintiff returned to Nurse Grass for complaints of swollen adenoids, shoulder pain, and depression resulting from an inability to work. Plaintiff reported that Dr. Benz had no other surgical options. Nurse Grass prescribed Celexa for depression and referred Plaintiff to Dr. Pasia for pain management. (Tr. 727-31)

On October 23, 2009, Dr. Eric Pasia evaluated Plaintiff and assessed chronic bilateral shoulder pain. Dr. Pasia prescribed pain medication and recommended shoulder exercises, weight

loss, and relaxation techniques. (Tr. 910-13) On November 20, 2009, Plaintiff returned to Dr. Pasia for a follow up visit. Plaintiff continued to complain of shoulder pain but reported improvement. He was more active and compliant with his exercise program, and his sleep and overall function had improved. Dr. Pasia assessed improving bilateral shoulder pain and depression. (Tr. 749-52)

On November 3, 2009, Plaintiff stated that he was doing well with regard to his breathing. His complaints included shoulder and hand pain, for which he was seeking disability. Dr. Avellone diagnosed mild reactive airway disease, well controlled. (Tr. 675-76)

Plaintiff sought treatment for his allergies from Dr. Kevin Boatright on November 12, 2009. Dr. Boatright noted that Plaintiff's chronic problems included allergic rhinitis, NOS, improving; asthma, NOS, controlled; chronic airway obstruction, controlled; and esophageal reflux, controlled. (Tr. 789-91) Subsequent visits with Dr. Boatright from December 2009 through May 2010 revealed recurrent allergic rhinitis, NOS, which Dr. Boatright treated with medication, environmental controls, and immunotherapy. (Tr. 789-802)

On December 2, 2009, Nurse Grass submitted a letter indicating that she had been Plaintiff's primary care provider for a number of years and that she felt he was unable to continue employment as an electrician. She listed his impairments as persistent pain; marked limitation to perform overhead movements; allergic rhinitis; chronic mild reactive airway disease; hypertension, currently controlled; and depression. (Tr. 335)

Between December 16, 2009 and May 19, 2010, Plaintiff continued to see Nurse Grass and Dr. Pasia at the Ste. Genevieve County Memorial Hospital Clinic. On December 16, 2009, Plaintiff saw Nurse Grass and complained of depression and cat scratch fever. (Tr. 717-22) On

January 15, 2010, he followed up with Nurse Grass for depression medications, and he indicated that his depression improved with increased Celexa. (Tr. 713-16) Plaintiff saw Dr. Pasia on January 21, 2010 and stated that he was doing better and was able to do more work around the house without pain. (Tr. 775-78) Plaintiff returned to Dr. Pasia on April 1, 2010, complaining of left shoulder pain. He indicated that he may have overdone it working around the house. Dr. Pasia assessed exacerbation of left shoulder pain. (Tr. 757-60) On April 15, 2010, Plaintiff complained of some continued shoulder pain but not as bad as two weeks ago. (Tr. 761-64) Plaintiff saw Nurse Grass on May 19, 2010 and stated that he felt better when taking both Wellbutrin and Celexa for depression. He also sought a refill of Allegra for his allergic rhinitis. (Tr. 703-06)

On November 21, 2010, Plaintiff underwent a consultative examination for a disability determination at Jefferson Multi-Specialty Group with Meredith Hartle, D.O. Dr. Hartle noted Plaintiff's shoulder pain and chronic bronchitis. Plaintiff reported that he was unable to perform his work activities due to numbness and pain in his hands; elbow numbness; and shoulder pain. Dr. Hartle assessed pain in joint, shoulder region; pain in joint, hand; and disturbance of skin sensation. With regard to shoulder pain, Dr. Hartle opined that Plaintiff could not fulfill his responsibilities as an electrician on a daily basis. However, he could fully perform functions such as sitting, standing, walking, hearing, speaking, and traveling. Plaintiff's ability to lift and carry would be limited. (Tr. 820-22)

On February 3, 2011, Plaintiff presented to the Jefferson County Regional Medical Center for complaints of shortness of breath. He stated that the day before, he experienced a coughing fit and passed out. the ER doctor assessed acute respiratory failure secondary to COPD

exacerbation; syncopy; and hypertension, uncontrolled. Plaintiff was treated with IV steroids, antibiotics, and nebulizer treatments. He was discharged on February 6, 2011 in stable condition. (Tr. 846-51)

Plaintiff returned to Sharon Grass on February 8, 2011, for a hospital follow up visit. Plaintiff indicated that he was taking Ventolin, Prednisone, and Vibramycin. (Tr. 874-78) On March 23, 2011, Plaintiff indicated that he could not afford his medication. (Tr. 879-84) Plaintiff complained of severe right arm pain with occasional tingling in the fingers on July 18, 2011. Plaintiff reported that he had increased the repetitive motion of the right arm while fishing two weeks ago. Nurse Grass noted right elbow tenderness in the lateral epicondyl and right scapular area, along with decreased range of motion strength in the right arm. She assessed lateral epicondylitis and noted that Plaintiff was given elbow strengthening exercises and an elbow brace. (Tr. 885-89)

On October 6, 2011, Nurse Grass submitted another statement regarding Plaintiff's disability application. She noted Plaintiff's persistent pain and marked limitation of his range of motion in his shoulders, particularly when attempting to perform overhead movements associated with his electrician job. In addition, Plaintiff continued to have problems with allergies leading to sinus infections and inflammation. While the allergist recommended that Plaintiff resume immunotherapy, Plaintiff could not afford treatment. Nurse Grass also mentioned mild depression since the loss of his job, controlled with medication. However, his depression had become more complicated and required psychiatric care and counseling. She opined that Plaintiff could not continue in his present field of employment, and retraining for other employment in the immediate

future would likely be unsuccessful due to his medical issues.  (Tr. 904-05)  Plaintiff returned to Nurse Grass on August 31, 2011 for a follow up on a dietician visit. (Tr. 944-49)

On June 1, 2011,  Plaintiff underwent a 45 minute psychological evaluation, after referral by the Missouri Department of Social Services.   Plaintiff complained of depression and mentioned that he had difficulty due to all his operations.   He stated that he felt hopeless and worthless.  The evaluator's diagnoses included major depression, moderate; cocaine dependence, in full sustained remission per patient; hallucinogen dependence, in full sustained remission per patient; and a GAF of 60, which included low mood, limited energy and problem solving, and suicidal thoughts with no intent.  The evaluator opined that Plaintiff would benefit from a psychiatric evaluation and treatment, which could allow him to engage in gainful activities on a more consistent basis.  (Tr. 895-99)

Plaintiff underwent a nerve study at Ste. Genevieve County Memorial Hospital on September 9, 2011, after complaining of neck pain radiating to the right shoulder and into his hands.  The test revealed mild acute C4, C5 and C6 radiculopathy on the right.  (Tr. 950) Diagnostic imaging on September 15, 2011, showed cervical spondylosis primarily C5-6 and C6-7.  (Tr. 956)  A C-spine MRI on September 20, 2011 revealed C5-6 and C6-7 spondylosis without cord or nerve rood impingement and mild anterior C1-2 arthropathy.  (Tr. 957)

Plaintiff returned to Nurse Grass on September 28, 2011 for a check up and refill of muscle relaxant.  Plaintiff began an adult fitness program and had lost 7 pounds.  He started physical therapy for his neck, and his arm and neck felt better for a few days after but then the pain returned.  His depression was not much better.  (Tr. 959-63)

On October 11, 2011, Vickie Bruckerhoff, BSW, MSW, LCSW, BCD, wrote a letter on behalf of Plaintiff to support his disability application. Ms. Bruckerhoff worked for Ste. Genevieve County Memorial Hospital Behavioral Health Services and indicated that she saw Plaintiff on September 30, 2011 and October 6, 2011. She noted Plaintiff's worsening depression and multiple surgeries. Ms. Bruckerhoff opined that, due to his multiple medical issues and worsening symptoms of severe depression and anxiety, Plaintiff would have difficulty continuing to work in his present field of employment and possibly in any other field at the time. She assessed major depression, recurrent, severe; economic or financial problems, unemployment, and adjustment disorder; and a GAF of 41 to 50. (Tr. 860)

Plaintiff sought psychiatric care at Community Counseling Center with Dr. Shajitha Nawaz. After an initial evaluation on November 9, 2011, Dr. Nawaz assessed major depressive disorder, recurrent-moderate; anxiety disorder, NOS; hypertension, diabetes mellitus type II; moderate social environment, primary support group, and economic problems; and a GAF of 60. He prescribed Cymbalta and Ativan and encouraged Plaintiff to continue therapy. (Tr. 976-77) On April 20, 2012, Dr. Nawaz assessed major depressive disorder, recurrent; anxiety disorder, NOS; and a GAF of 55. (Tr. 968)

### IV.  The ALJ's Determination

In a decision dated January 24, 2012, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. He had not engaged in substantial gainful activity since his alleged onset date of February 24, 2009. The ALJ further found that Plaintiff had the severe impairments of asthma, osteoarthritis, hypertension, diabetes mellitus, and obesity. The ALJ stated that the severity of Plaintiff's allegations of depression was

not supported by the medical evidence in the record and was non-severe. Further, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14-18)

After carefully considering Plaintiff's subjective allegations and all of the medical evidence, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a range of light work, except that he could sit for up to 6 hours in an 8-hour workday with a brief sit/stand option every hour to allow change of position. In addition, he could only occasionally reach overhead; never climb ladders or scaffolds; only occasionally climb ramps or stairs; and only occasionally stoop, kneel, or crawl. With regard to environmental hazards, Plaintiff needed to avoid concentrated exposure to irritants and hazardous machinery. The ALJ determined that Plaintiff was unable to perform any of his past relevant work. However, based upon his age of 49 on his alleged onset date, which was defined as a younger individual, his high school education, his acquired work skills, and his RFC, the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. These jobs, as the VE testified, included security guard, reception or information clerk, and file clerk. Therefore, the ALJ concluded that Plaintiff had not been under a disability from February 24, 2009 through the date of the decision and was not disabled. (Tr. 19-27)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992); <u>Brand v. Secretary of Health Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. <u>Id</u>. at 1354; <u>Ricketts v. Secretary of Health & Human Servs.</u>, 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the <u>Polaski</u>[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

---

[1]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

## VI.  Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint.  First, he argues that substantial evidence does not support the ALJ's RFC determination.  Plaintiff also contends that the record does not support the ALJ's credibility findings.  Defendant, on the other hand, asserts that the ALJ properly determined Plaintiff's RFC and properly assessed Plaintiff's credibility.  The undersigned finds that substantial evidence supports the ALJ's determination.

## A.  Credibility Determination

Plaintiff asserts that the ALJ erred in his credibility analysis of the Plaintiff.  Defendant maintains that the ALJ properly performed a detailed credibility analysis and carefully considered Plaintiff's testimony, as well as the medical records.  The undersigned agrees with the Defendant.

An ALJ may discount a plaintiff's complaints where there exist inconsistencies in the record as whole.  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).  Further, courts defer to the ALJ's credibility determination so long as the ALJ explicitly discredits plaintiff's testimony and provides good reason for doing so.  Id. (citation and internal quotations omitted).  Here, the ALJ thoroughly considered testimony regarding his alleged impairments and pain.  (Tr. 20)  The ALJ noted that, while Plaintiff's impairments could be expected to cause the alleged symptoms, Plaintiff's statements pertaining to the intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the RFC assessment.  (Tr. 20)   The ALJ discussed Plaintiff's daily activities, noting that he could prepare meals occasionally, clean up dishes, wipe down counters, pick up the bedroom, make the bed, help change bed linens, and care for his personal needs.  (Tr. 15)  These activities are inconsistent with the type of limitations Plaintiff alleged.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (finding the ALJ's credibility

assessment was proper where plaintiff was not very active but was able to care for himself and perform household chores); Choate, 457 F.3d at 871 (affirming the ALJ's finding that self-reported limitations on daily activities were inconsistent with the plaintiff's testimony and the medical record).

Further, the ALJ correctly found that Plaintiff was able to control his symptoms with medication, an elbow brace, physical therapy, and exercise. (Tr. 24-25) An impairment that can be controlled by treatment or medication cannot be considered disabling. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citation and internal quotations omitted). Finally, the ALJ noted that, despite some limits to functionality, his conditions and pain did not greatly inhibit his daily activities, and Plaintiff was able to perform home improvements and go fishing. (Tr. 24-25) "The issue in credibility determination is not whether the claimant actually experiences pain, but whether the claimant's symptoms are credible to the extent that they preclude all substantial gainful activity." Lewis v. Astrue, No. 4:10CV1131 FRB, 2011 WL 4407728, at *20 (E.D. Mo. Sept. 22, 2011) (citing Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998)). "The mere fact that working may cause pain or discomfort does not mandate a finding of disability . . . ." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (citation omitted). In short, the ALJ properly assessed Plaintiff's subjective complaints and disbelieved his subjective reports based on inconsistencies in the record. See Eichelberger v. Barnhart, 390 F.3d 584, 589-90 (8th Cir. 2004) (holding that an ALJ may disbelieve subjective complaints because of inherent inconsistencies and that the ALJ has the statutory duty in the first instance to assess a claimant's credibility).

## B. RFC Determination

Plaintiff also argues that the ALJ's RFC finding conflicts with the decision in that the RFC finding limits Plaintiff to sedentary work because of the language "except that he can sit for up to 6 hours in an 8-hour workday," yet the ALJ explicitly states that Plaintiff can perform a range of light work, which requires a good deal of walking and standing. Plaintiff contends that this ambiguity requires remand. Defendant maintains, however, that the ALJ inadvertently left out a reference to standing and that this omission does not require remand because it has no bearing on the outcome. The Court agrees with Defendant.

With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." Eichelberger, 390 F.3d at 591 (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1).

While the ALJ's RFC finding does not include the term "standing," the ALJ does reference a sit/stand option, and the question to the VE indicates an ability to sit and/or stand/walk for six hours during an eight-hour workday. (Tr. 68) Specifically, the VE asked for a clarification regarding the sit/stand option, and the ALJ indicated that the light exertional level allowed a person to sit for up to six hours or stand and walk for up to six hours. (Tr. 68) Based on this information, the VE answered that the individual could work as a security guard, reception clerk, or file clerk. (Tr. 69) The record shows that the ALJ then relied on this testimony to find

that Plaintiff could perform work in the national economy. The omission of the term "stand/walk" from the RFC finding is merely a deficiency in opinion writing technique and does not have a bearing on the outcome. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008). Thus, remand on that basis is not warranted. Id.

Plaintiff also argues that the medical evidence fails to support the RFC determination for the lifting and carrying requirement of light work. Plaintiff states that his ongoing shoulder and hand impairments require further restrictions. Defendant contends that the overhead reaching limitation set forth by the ALJ adequately accounts for Plaintiff's shoulder problems. Defendant further asserts that Plaintiff's hand impairments improved significantly with surgery.

Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Here, the record demonstrates that Plaintiff has experienced shoulder problems, including osteoarthritis, rotator cuff tears; and rotator cuff surgery. Plaintiff's condition improved with surgery but returned after doing a lot of work around the house, including putting up 5 ceiling fans. (Tr. 757) Prior to overusing his shoulders, Plaintiff reported improvement to his shoulder pain through a home exercise program, including weights. (Tr. 751, 753) Nurse Grass also noted that Plaintiff's pain and limitations in his shoulders primarily occurred when performing overhead movements. (Tr. 904) As the Defendant points out, the evidence shows that Plaintiff aggravated his shoulder injury through overhead activities. The ALJ took this into account when limiting Plaintiff to only occasional overhead reaching.

Additionally, with regard to Plaintiff's use of his hands, the ALJ correctly noted that Plaintiff's carpal tunnel release surgeries successfully relieved the numbness and tingling in his

hands. (Tr. 22, 421) Plaintiff complained of right arm pain and occasional tingling in fingers only after going fishing and using repetitive wrist and elbow motion. (Tr. 885) Nothing in the medical records supports Plaintiff's allegations that his hand impairments required further lifting restrictions.

Finally, Plaintiff claims that the ALJ erred in failing to impose greater pulmonary restrictions due to his sinus problems. However, the ALJ's determination belies Plaintiff's argument, as the ALJ did restrict Plaintiff to avoiding concentrated exposure to irritants. (Tr. 19) Further, the medical evidence shows that Plaintiff's sinus problems were well-controlled with medication and environmental controls after undergoing sinus surgery in 2007. (Tr. 922, 924, 930-32, 942) In November 2009, Plaintiff reported that he almost never needed his rescue inhaler. (Tr. 675) Although Plaintiff was admitted to the hospital for shortness of breath in February 2011, he was treated with antibiotics, steroids, and albuterol and released in improved condition. (Tr. 849) The undersigned finds that the ALJ adequately accounted for Plaintiff's sinus problems in making the RFC determination.

Upon careful review of the record, it is apparent that the ALJ determined Plaintiff's RFC after closely examining the record and taking into account all of Plaintiff's credible limitations. "The ALJ thoroughly analyzed all of the medical and non-medical evidence, performed a legally sufficient analysis of the credibility of plaintiff's subjective allegations, and then formulated a specific RFC that took into account all of plaintiff's limitations caused by his medically determinable impairments that the ALJ found to be credible and supported by the record." Teal v. Colvin, No. 1:11CV191 SNLJ/FRB, 2013 WL 1363727, at *19 (E.D. Mo. Mar. 18, 2013); see also Eichelberger, 390 F.3d at 591 (citation omitted) ("The ALJ determines a claimant's RFC

based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations.").

Thus, the Court finds that the ALJ did not err in assessing Plaintiff's RFC. "The ALJ thoroughly discussed the medical records before outlining his RFC determination, which [this Court] conclude[s] is supported by substantial evidence." Gaston v. Astrue, 276 F. App'x 536, 537 (8th Cir. 2008). Therefore, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff had not been under a disability from February 24, 2009 through the date of the decision. The decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


                                                _/s/ Terry I. Adelman_
                                         UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of February, 2014.